The State ex inf. Robert W. Otto, Attorney-General, v. St. Louis College of Physicians & Surgeons. — 295 S. W. 537.

Court en Banc, May 23, 1927.

1. **CORPORATION: Ouster: Grounds.** A proceeding by quo warranto upon an information by the Attorney-General will lie to forfeit the charter of a corporation for exercising corporate powers without authority, or for the abuse, misuse or non-use of its corporate charter.

2. ———: ———: **Burden of Proof.** In a proceeding by quo warranto upon information of the Attorney-General to forfeit the charter of a corporation, the burden of proof to sustain the charges as laid in the information is upon the informant.

3. ———: ———: **Necessary Proof.** In a proceeding by quo warranto to forfeit the charter of a corporation, brought by the Attorney-General upon his own information, the informant must sustain the charges as laid in the information, or enough of them to constitute grounds in law for invoking the writ; otherwise, the information will not be sustained.

4. ———: ———: **Medical College: Fraudulent Degrees and Diplomas: Misuser.** A corporation organized under the general laws of the State as a college has implied powers to grant degrees and issue diplomas; but notwithstanding the corporation has authority by the terms of its charter to grant degrees, a fraudulent exercise thereof is such a misuser of the franchise of such an educational institution as will justify its forfeiture.

5. ———: ———: **Acts of Officers and Agents.** The acts and omissions of the officers and agents of a corporation are imputable to it in so far as they constitute grounds for a forfeiture of its charter.

6. ———: ———: **Medical College: Abuse and Misuse of Charter.** Evidence showing that the agent of the respondent in charge of its medical school entered into arrangements with Adcox, whose license to practice medicine had been revoked for misconduct, under which Adcox procured the attendance of students at the school and the sums of money received from such students were divided between him and the agent of respondent in charge of the school; that such agent of respondent, acting under its agreement with Adcox, gave advances to students so entering the school, to which they were not entitled under the rules held out by respondent, and thereby enabled such students to graduate and receive diplomas from respondent, when they had not in fact completed the course of study which respondent professed to require; that a diploma was issued to a student from another state after he had been in attendance one year, for a consideration of six hundred dollars paid to Adcox and said agent of respondent; that a diploma was issued to a pretended student who had never attended the college; that the secretary of the board offered to sell to a student a diploma for fifteen hundred dollars, and other facts showing that the officers and agents were exercising the functions and carrying on the business of the medical college primarily for their own pecuniary profit, show an abuse and misuse of the corporation's powers, and authorize a forfeiture of its charter, and a decree ousting it of all its powers, franchises and privileges.

7. ———: ———: ———: **Evidence: Action of State Board of Health.** The fact that the respondent medical college was not recognized by the State Board of Health as a reputable college does not ipso facto constitute a ground for the forfeiture of respondent's charter, but the failure of re-

317 Mo.—4.

spondent to maintain a college recognized as reputable by the State Board is evidence to be taken into consideration, in connection with all other evidence tending to show an abuse and misuse of its franchises, in determining whether it has misused and abused its charter powers.

Corpus Juris-Cyc. References: **Colleges and Universities,** 11 C. J., Section 8, p. 984, n. 4; Section 39, p. 1000, n. 99, 5 New, 6. **Corporations,** 14a C. J., Section 3712, p. 1107, n.. 8; Section 3714, p. 1109, n. 37; Section 3717, p. 1112, n. 71. **Quo Warranto,** 32 Cyc., p. 1425. n. 93; p. 1461, n. 86, 94.

## *Quo Warranto.*

Ouster awarded.

*North T. Gentry,* Attorney-General, and *J. Henry Caruthers,* Assistant Attorney-General, for relator.

(1)  That a proceeding by information in the nature of *quo warranto* by the Attorney-General will lie to forfeit the charter of a corporation for exercising corporate powers without authority or for the abuse, misuse or non-use of its corporate charter is well settled in this State. Sec. 10276, R. S. 1919; State v. Standard Oil Co., 218 Mo. 345.  (2)  Respondent corporation was organized under what is now Art. XI, Chap. 90, R. S. 1919, relating to Benevolent, Educational and Miscellaneous Associations. No association, society or company formed for pecuniary profit in any form, shall be incorporated under this article. Sec. 10271, R. S. 1919; In re St. Louis Institute of Christian Science, 27 Mo. App. 640; State ex inf. v. Rod & Gun Club, 121 Mo. App. 368.  (3)  The Attorney-General may institute proceedings by information in the nature of *quo warranto* against a corporation and thereby inquire into any alleged unlawful acts of or misuser or non-user of its franchise. Sec. 10276, R. S. 1919; State ex rel. v. Board of Trustees, 175 Mo. 58; State ex inf. v. Rod & Gun Club, 121 Mo. App. 368; State ex rel. v. Men's Club, 178 Mo. App. 568; Nicholas v. Evangelical Deaconess Home, 281 Mo. 190.  The charter of a medical school may be revoked by the courts when it confers degrees and issue diplomas without regard to the qualifications of the applicant to practice medicine. Ind. Med. Coll. v. People, 182 Ill. 274; Ill. Health University v. People, 166 Ill. 178; Edgar Coll. Institute v. People, 142 Ill. 366; State ex rel. Attorney-General v. College Co., 63 Ohio, 341; 10 Cyc. (par. 13) 1291; 11 C. J. (par. 39) 1000.  (4)  Every agent or employee of a university or college is liable for the misuse of moneys received by him in his fiduciary capacity. 11 C. J. (par. 24) 994.  (5)  It is and was the duty of respondent to comply with the terms of Sec. 7332, R. S. 1919, as amended, Laws 1923, p. 254, which requires that all persons desiring to practice medicine and surgery in this State shall appear before the State

Board of Health and be examined as to their fitness to engage in such practice, and "they shall furnish satisfactory evidence of having received a diploma from some reputable medical college of four years' requirements, including two years' experience of operative and hospital work at the time of graduation." When a corporation is organized under a general enabling act its charter consists of the provisions of the existing Constitution, the particular statute under which it is formed, and all other general laws which are made applicable to the corporation formed thereunder, and of the articles of association filed thereunder. 14 C. J. (par. 108) 117; State v. Cummings, 13 Mo. App. 200; State ex rel. v. Nat. School of Osteopathy, 76 Mo. App. 443; Danville v. Water Co., 178 Ill. 306; Interstate Cons. St. R. v. Mass. 207 U. S. 84; Westport Stone Co. v. Thomas, 175 Ind. 327; Traer v. Prospecting Co., 124 Iowa, 112; Society v. Commonwealth, 52 Pa. 131; 11 C. J. (par. 8) 983; State ex rel. v. Gregory, 83 Mo. 130; Steinhauer v. Arkins, 18 Colo. App. 51; People v. Hom. Med. Coll. 20 N. Y. Supp. 379.

*Frank Coffman* for respondent.

(1) Respondent's demurrer to the information should be sustained. (2) *Quo warranto* proceedings are criminal in their nature, and are in the nature of a public prosecution. They have for their object, the recovery to the State of usurped or forfeited franchises. State ex rel. v. Men's Club, 178 Mo. App. 562. (3) It devolves upon the State, in *quo warranto* proceedings, to both charge and prove the abuse or misuser of franchises, relied upon as a ground for forfeiture. And the State has the burden of proof. State ex rel. v. Talbot, 123 Mo. 68. (4) Before respondent's charter or franchise can be forfeited, where, as in this case, respondent's charter on its face entitles the corporation to exist under the law under which it is formed, the State must charge it with some act that is unlawful, or with some act that is detrimental to the public welfare, or that its acts threaten substantial injury to the public, or that there was an entire non-user or an abandonment of the charter. State ex inf. v. Railway, 176 Mo. 709; State ex rel. v. Men's Club, 178 Mo. App. 562; State ex rel. v. Talbot, 123 Mo. 69. (5) There was a total failure of proof that the acts complained of were detrimental to the public health, or threatened substantial injury to the public; a failure on the part of the State to carry the burden of proving that said acts existed at all, and no attempt to prove that there was a non-user or abandonment of the charter.

ATWOOD, J.—This is an original proceeding by information in the nature of *quo warranto* for the purpose of forfeiting respondent's

charter, articles of incorporation, franchises, powers and privileges, and ousting respondent.

Relator charged that respondent ''is and has been since the 8th day of August, 1879, a corporation incorporated and organized as a medical college under and by virtue of the statutes with respect to the incorporation of benevolent, religious, scientific, fraternal-beneficial, educational and miscellaneous associations, being now Chapter 90, Article 11, of the Revised Statutes of 1919.

''That said respondent was incorporated for the purpose of teaching and giving scientific instruction to those desiring to be educated and fitted for the practice of medicine and surgery and its relative branches, in the State of Missouri and elsewhere, whose place of business is and has been in St. Louis, Missouri.

''Relator states that respondent is now and has been guilty of gross perversion and misuse of its charter powers, franchises and privileges, as a medical college and institution; that it is now and has been guilty of unlawfully usurping the powers, privileges and franchises not granted by its said charter or by the laws of the State of Missouri, and especially in the following particulars, to-wit:

''1.   That no fair or intelligible record of the proceedings of said college or institution is now or has been kept as by law required.

''2.   That said college and institution has been and is being maintained for private emolument, benefit, profit and gain, contrary to the law of its incorporation.

''3.   That respondent is now and has been engaged in the unlawful traffic, barter and sale of diplomas and certificates of graduation, purely for monetary and mercenary considerations, and without regard to the educational and scientific qualifications or fitness of those to whom such diplomas and certificates of graduation are and have been issued.

''4.   That the pretended instruction imparted by said respondent to its students is largely by the students themselves or by certain students selected from the student body, who are entrusted with the duty of teaching classes, making scientific demonstration and carrying on the work which should be and can only be carried on by a faculty of competent instructors; that the students so charged and engaged in the functions of teaching are incompetent and unable to so direct or perform the work of teaching or giving instruction as to carry out the purposes of respondent's charter in the promotion of the study of the theory and practice of medicine, surgery and dentistry.

''5.   That respondent is and has been operating under its charter as a scientific medical institution or college, but using the same as a mere subterfuge for the actual benefit or behoof of an individual or group of individuals, concerned ostensibly with the conduct of a non-profit, scientific educational institution, but in fact concerned in the

private advantage, profit and gain the same may afford or bring to him or them.

"6. That respondent has heretofore failed and is now failing to maintain a properly organized curriculum covering four years' instruction, contemplated as essential for a medical school of four years' requirement as provided by statute.

"7. Respondent does not and has not provided, for the purpose of instruction, any dispensary for the reception of patients, nor any hospital in which patients are received and treated, and thus deprives its students of the instruction and study of the progress and cure of disease in actual objective cases, without which instruction no student can be competent to .practice medicine and surgery with safety to the life and health of the public.

"8. That such abuse and misuse of the powers, franchises and privileges by said respondent of its charter of incorporation, and such unlawful usurpation by said respondent of powers, franchises and privileges not granted by said charter, or by the laws of the State of Missouri, as hereinbefore stated, affects the public interest and welfare, and is greatly harmful and injurious to the public."

Respondent's answer and return alleged that there were not sufficient facts stated in the information to constitute a cause of action, and denied all the allegations of the information except that of respondent's incorporation. Issues of fact being thus joined Honorable Edwin J. Bean of St. Louis, Missouri, was appointed commissioner to take the testimony and report on the law and the facts, and his report has been duly filed and the cause briefed, argued and submitted in this court.

Motion to dismiss the cause for failure to comply with our rules accompanied respondent's printed statement, brief and argument, and was taken with the case. Upon due consideration of said motion we find that it is without merit and the same is now overruled.

Before any evidence was taken by the commissioner counsel appearing for respondent objected to the introduction of any evidence in the case on substantially the same grounds pleaded in respondent's answer and return, which objection was by the commissioner overruled.

The evidence comes to us well ruled by the commissioner in the form of a typewritten transcript of about one thousand pages, and his findings of facts and conclusions of law accompanying the same are so accurate, thorough and succinct that we quote with approval from the Commissioner's Report as follows: .

"On the ―― day of July, 1879, William Hyde and six other persons entered into articles of association in writing for the formation of a body corporate under the name of the St. Louis College of Physicians and Surgeons. This agreement was entered into pursuant

to Revised Statutes of Missouri, Article XIII, Chap. 37, Wagner's Statutes and Amendments thereto.

"On the 30th day of July, 1879, the Circuit Court of the City of St. Louis entered an Order constituting the St. Louis College of Physicians and Surgeons, respondent herein, a corporation under the laws of the State of Missouri. Whereupon a certified copy of said articles of association and a copy of the said decree of the circuit court were filed in the office of the Secretary of State of the State of Missouri, and a certificate of incorporation was issued to respondent by the Secretary of State on the 8th day of August, 1879. The purpose of the incorporation of respondent and the names of its trustees, as set out in its articles of association, were as follows:

" 'The object of the "St. Louis College of Physicians and Surgeons" is to be the establishment and maintenance of a medical college for the advancement of medical science, the instruction of students in the science and art of medicine, by a regular appointed faculty of qualified physicians and surgeons to examine them after a thorough course of instruction and to grant to them degrees in medicine and collateral branches according to their knowledge and efficiency, provided, however, that such degrees in medicine and collateral sciences shall not be granted, unless the candidates for such degrees have attended instructions at the St. Louis College of Physicians and Surgeons for the prescribed time, have attained the age of twenty-one years, and given evidence of their diligence and moral character.

" 'The number of trustees shall be seven or more, of whom the following shall be the first board of trustees, namely:

" 'William Hyde, 2025 Pine Street; Louis Bauer, 3005 Cass Avenue; William B. Hazard, 2725 Clark Avenue; Gustavus Woltmann, 1309 Hickory Street; Charles P. Warner, 519 Walnut Street; Ellis Wainwright, 1121 Morrison Avenue; Augustus A. Mellier, 709 and 711 Washington Avenue.

" 'The operation of said association shall be carried on in the city of St. Louis.'

"On the 28th day of December, 1887, respondent's articles of association were duly amended by adding thereto provisions authorizing the establishment and maintenance by respondent of a department for teaching dentistry.

"About the year 1895, the college of respondent was located in a four-story brick building at the corner of Jefferson and Gamble streets, in the city of St. Louis, and the school of respondent is now carried on there. That the respondent corporation was organized in good faith, for the purpose named in its charter, and that respondent for many years carried on the work for which it was created, is not questioned.

"Respondent's school has been carried on as an independent institution since its organization, with the exception of one year. During the school year of 1915-1916 it was merged with the National University of Arts and Sciences, which was also in the city of St. Louis.

"Since the year 1915, the respondent's college was not at all times recognized by the State Board of Health of the State of Missouri as a reputable medical college within the meaning of the Medical Practice Act of this State.

"Dr. Waldo Briggs took an active part, in the year 1921, in procuring and bringing about amendment of the Medical Practice Act of this State by striking therefrom the word 'reputable' as qualifying a medical college from which an applicant for examination by the State Board of Health for license to practice medicine in this State must hold a diploma.

"The building and premises occupied by respondent's school was estimated to be worth about seventy-five thousand dollars, it having cost forty-two thousand dollars in the year 1895. During the past ten years the respondent's college had an average annual attendance of about forty students. In recent years the course of study for graduation as held out by the respondent, covered a period of four school years of thirty-two weeks each. Members of the faculty of respondent were not paid for their services other than the dean, the secretary of the school and such members of the faculty who conducted laboratory work and received laboratory fees, the amounts of which were not made certain by the testimony. The members of the faculty consisted of practicing physicians and surgeons, residents of the city of St. Louis."

The commissioner further found that Dr. Waldo Briggs, who had received his medicial education in the University of Medicine, Nashville, and Vanderbilt, in the State of Tennessee, came to St. Louis thirty-eight years ago, at the age of thirty-one years, to practice medicine and surgery; that in the year 1895 he took the chair of surgery on respondent's faculty, became dean of the faculty, and in 1898 became a member of the board of trustees; that he was reelected and continued to serve both in the capacity of dean and trustee, also serving as president and as treasurer of the board of trustees, and was respondent's president, treasurer, dean and managing officer for many years prior to the filing of the information herein.

"The minutes of a meeting of respondent's board of trustees held on July 3, 1909, recited that a short time prior thereto a corporation had been formed under the laws of the State of Missouri, known as the St. Louis College of Physicians' and Surgeons' Realty and Holding Company, and which had acquired from Dr. Waldo Briggs the property at the southwest corner of Gamble Street and Jefferson Avenue, in the city of St. Louis, now used by the St. Louis College of

Physicians and Surgeons as a college or school of medicine, which said property is now subject to a debt secured by a deed of trust amounting to $12,500. It was further recited that said property was offered to the respondent for the price of $62,500, and that a resolution was adopted authorizing the purchase by respondent from said Holding Company of the property above described, including furnishings and equipment for the price $52,500, to be paid in bonds of the respondent secured by deed of trust upon the said property, and respondent to assume the outstanding indebtedness on the property of $12,500, as aforesaid. This proposed transaction between the respondent and the Holding Company does not seem to have been carried out.

"The minutes of the meetings of the board of trustees of the respondent show that at a meeting thereof, held on the 22nd day of April, 1915, a resolution was passed reciting that the property occupied by the respondent's college belonged to Dr. Waldo Briggs, and directions were given by said trustees, as shown by the said minutes, that a deed for said property be executed and delivered to said Dr. Waldo Briggs. Dr. Waldo Briggs admitted, while testifying as a witness in this case, that a deed to said premises occupied by the college conveying the title thereto to him had been executed and delivered to him, but had not been placed of record. The minutes of a meeting of the board of trustees of respondent, held on June 10, 1915, show that respondent was authorized to renew its lease from Dr. Briggs of the property occupied by it at the corner of Jefferson Avenue and Gamble Street, in the city of St. Louis, for a period of five years from July 1, 1915. The rental to be paid by respondent to Dr. Waldo Briggs was twenty-four hundred dollars per annum, payable monthly. For many years prior to the filing of this information, Dr. Waldo Briggs was in charge of the management and control of respondent's college. All moneys due the respondent were collected and received by Dr. Waldo Briggs. The expenses of operating the college were paid by Dr. Briggs on its behalf. He testified that, when the funds received from operating the college were not sufficient to pay its debts, he, Dr. Briggs, paid the deficit from his own funds; that there had often been a deficit which had been paid by him. Dr. Briggs testified that he had paid for the past twenty years, for the purpose of maintaining and carrying on the school, an average of one thousand dollars per year. Dr. Waldo Briggs told Dr. Waite in November, 1923, that the receipts of respondent for the previous school year were fifteen thousand dollars, and the expenses for the same period were eleven thousand dollars.

"The respondent kept no bank account, but the funds were all received and disbursed by Dr. Briggs and he kept no account thereof in behalf of respondent. Dr. Briggs did not report to the trustees the amounts received and paid out by him in conducting respondent's

college. The records of the respondent, after Dr. Briggs became dean, were kept by the secretary or other agents under the direction of the dean. Respondent charged tuition and other fees to students attending the college. For several years prior to the filing of the information herein, the duties and authority of the trustees of respondent, other than Dr. Waldo Briggs, were nominal. Dr. Waldo Briggs controlled and managed respondent's college.

"Dr. Lillie, who was secretary of respondent's board of trustees for one year beginning in May, 1924, estimated the income of respondent, from tuition and other fees paid by students, to have been six or seven thousand dollars during the time that he served as secretary.

"One Robert Adcox was graduated in the year 1910 as a physician, after taking a course of studies for four years at the Barnes Medical College and the American Medical College, in the city of St. Louis.

"His license to practice medicine was revoked in 1923 for misconduct, and he was convicted in the trial court of bribery in connection with procuring from county superintendents of schools false certificates as to educational qualifications of persons desiring to become medical students.

"Robert Adcox procured students for attendance at the National University of Arts and Sciences at St. Louis, and there met Dr. Waldo Briggs during the period of consolidation of the respondent's college with that of the National University of Arts and Sciences, which consolidation was during the school year of 1915-1916. After the separation of said schools and the return of the St. Louis College of Physicians and Surgeons to its present location, Dr. Robert Adcox entered into an agreement in writing with Dr. Waldo Briggs on behalf of the respondent. This agreement was entered into in the year 1917. It was agreed that Robert Adcox should, for a period of one year, solicit students for respondent's college and that he should receive therefor one-half of all charges paid to respondent by the students brought to the school, less laboratory fees. This agreement, while not renewed in writing, was continued by agreement by the parties thereto until the arrest of Robert Adcox in the month of October, 1923, for obtaining false certificates or credentials for students desiring to enter medical colleges.

"Robert Adcox was active in soliciting and obtaining students to attend respondent's college from 1917 until the time of his arrest on the date aforesaid. He procured the attendance of many students at respondent's college and was paid therefor by receiving part of the tuition and money to be charged the student for attending the college in pursuance of the terms of his agreements with Dr. Waldo Briggs.

"Adcox often collected the money from students for tuition and thereafter paid part of it to Dr. Briggs on behalf of respondent, either

by payment to him in cash or by checks. At the time said agreement between Dr. Waldo Briggs and Robert Adcox was entered into, and thereafter, the respondent offered to students course of medical instruction, divided into periods of four years, known as Freshman, Sophomore, Junior and Senior years.

"The respondent charged students for the freshman and sophomore years one hundred any twenty-five dollars per year, which included laboratory fees. Respondent charged at that time as tuition for students in junior and senior years one hundred fifty dollars per year, which included laboratory fees. About the year 1922 respondent increased its charges for tuition for all courses in the sum of two hundred dollars per year. In 1917 and thereafter, respondent had a rule that a student, in order to be admitted to respondent's college, must have preliminary education evidenced by a diploma from a high school, or its equivalent. Respondent at the same time made a practice of admitting students in its school to advance standing in the medical courses taught there, on a showing made by such students that credits for medical work had been obtained at other institutions. These credits were permitted to be shown by certificates from other institutions, affidavits of claimants for such credits, or the examination by respondent of applicants for advance standing in its school."

Relator introduced in evidence twenty-four cancelled checks, each signed by Robert Adcox, president of Bio Chemical Company, drawn on the Vandeventer Trust Company of St. Louis between February 14, 1921, and June 25, 1923, both dates inclusive, payable to the order of Dr. Waldo Briggs, and aggregating $4,749. Dr. Briggs admitted that Dr. Adcox delivered these checks to him and he cashed them. Dr. Adcox testified that the sums shown to have been paid to Dr. Briggs by means of these checks were paid to him in pursuance of the agreement between Adcox and Briggs, under which Adcox was to solicit students and receive half of the money charged the students, and that these checks were delivered to Dr. Briggs in payment of the amounts due him under this agreement. Dr. Briggs testified that the checks represented tuition from students which Adcox had collected and which was regularly due respondent.

Omitting excerps of the testimony we further quote from the commissioner's findings of facts:

"The foregoing cancelled checks, which were offered in evidence as Relator's Exhibits 4 to 27, inclusive, were obtained from the desk of Robert Adcox at his residence, on the —— day of October, 1923. At the time last aforesaid, Howard Sidener, Circuit Attorney of the City of St. Louis, with two police officers and a newspaper reporter, went to the residence of Robert Adcox in the city of St. Louis and arrested him, and also searched his desk and took therefrom many

papers.  Included in the papers taken from the desk of Robert Adcox at the time of his arrest, was the contract in writing between Dr. Briggs and Robert Adcox as entered into in 1917, and also a sheet showing the division of moneys between Briggs and Adcox on account of students procured for the school by Adcox.  Both of these documents had been lost and could not be produced at the hearing.

"Robert Adcox procured, with the knowledge of Dr. Waldo Briggs, the dean of respondent's college in charge of the management thereof, false and fraudulent certificates as to the preliminary qualifications of students desiring to enter respondent's college.  Such false and fraudulent certificates, which purported to show that students entering the school had the equivalent of a high school diploma, were accepted by respondent, and students were admitted to the college, when they were not, in fact, entitled to such admission according to the rules by which respondent professed to be governed in such matters.  Robert Adcox procured false and fraudulent medical credits for students entering respondent's college for the purpose of giving them advanced standing in the respondent's classes and thereby enabling them to graduate without four years' attendance.  Dr. Waldo Briggs, the dean of respondent, in charge of the school, with knowledge that said medical credits were not genuine, accepted students in whose behalf such credits were presented.  Students so procured by Adcox who did not have the preliminary qualifications which respondent's rule purported to require as to admission to the school, or for admission to the advance standing and graduated from the respondent's school, were admitted to the school and received diplomas therefrom.  Robert Adcox and Dr. Briggs charged students in excess of the regular tuition as a consideration for admitting them to advance standing in respondent's school and for graduation without completing the prescribed courses of the school.  .  .  .  .  .

"In 1922 one Andrew Draser, of the State of California, paid six hundred dollars to Adcox and Dr. Waldo Briggs for the purpose of securing advance standing and graduation from the respondent's school.  Draser was admitted to respondent's college and attended the same part of one year, then returned to California.  At the end of the school year Draser's diploma from the respondent's school was forwarded to him.  .  .  .

"Respondent issued a diploma to Harry J. O'Connor, who came to St. Louis from Chicago in 1917 or 1918 and was entered upon respondent's records as a student.  Thereafter a diploma was issued and sold to O'Connor in 1922 or 1923, when he had never attended respondent's college.  .  .  .

"After the arrest of Robert Adcox, respondent's college refused to graduate three students entered by Adcox and received to advance

standing, upon the ground that the credits which said students had been given were fraudulent. These were Mellilo, Boros and Granger.

"Dr. Sudcliff, secretary of respondent's board of trustees, sold and issued a diploma of respondent's college to one McGladigan, in 1918. This came to the knowledge of Dr. Waldo Briggs, and he caused said Sudcliff to be discharged.

"Dr. Waldo Briggs had trouble with his eyes, which caused his vision to be imperfect for several years before the filing of the information herein. Diplomas of respondent were signed by its trustees. Joseph R. Sintzel was secretary of the board of trustees of respondent prior to 1924. The secretary then had the custody of the diplomas and attended to their preparation. Dr. Waldo Briggs testified that he had never knowingly signed a diploma which was not properly issued, but that he had signed, relying on his secretary as to the contents of the instrument because his vision was so defective that he could at times only see to sign his name.

"In the fall of 1923, Joseph R. Sintzel told Delmer Sitton that if the records at the respondent's school were raided they would hang him (Sintzel). Sintzel asked Sitton to help him get the records. Sitton and Sintzel then loaded three big books and a little book from respondent's school into the back of a motor car of Sintzel's and Sintzel drove away.

"In the spring of 1923 Sitton was a student at the respondent's school and Joseph R. Sintzel offered to sell Sitton a diploma from respondent's college and a license to practice medicine in this State, for fifteen hundred dollars. Sintzel went to Connecticut, to testify there in the investigation of fraudulent licenses to practice medicine, and Sintzel was discharged by respondent upon his return from Connecticut. In 1924 Sintzel was employed by the State Board of Health of the State of Missouri to assist in the investigation of fraudulent practices of medical colleges. While Sintzel was secretary of respondent's board and after investigation of the school by the State Board of Health, the books and records of respondent were taken away from the college for a week or more, and when returned had been mutilated by tearing pages from the books. Sintzel's whereabouts was not known at the time of the hearing.

"The statutes of this State prior to 1921, which regulated the granting of licenses to practice medicine, provided that an applicant for examination by the State Board of Health for such a license must present satisfactory evidence of having received a diploma from a reputable medical college. This act was amended in 1921 by striking out the word 'reputable' as qualifying the word 'College' in the former statute. Thereafter, in 1923, the statute was again amended, and the word 'reputable' was placed in the act as qualifying the kind

of college from which an applicant for examination to practice medicine must have a diploma.

"In November, 1923, a committee of the State Board of Health went to inspect the college of respondent, with a view to determining whether it was a reputable medical college within the meaning of the Medical Practice Act of this State. This committee consisted of Dr. Emmett P. North, president of the State Board of Health, and the following members of said board: Dr. James R. McVay, Dr. R. S. Vitt, Dr. T. H. Wilcoxen and Dr. T. A. Son. This committee was accompanied by Dr. Frederick C. Waite, a medical educator of wide renown, of Cleveland, Ohio, who was employed and paid by the State of Missouri to assist the State Board of Health in making a survey of the medical colleges in this State. The committee went to the college of respondent at Jefferson Avenue and Gamble Street, in the city of St. Louis, and, accompanied and assisted by Dr. Waite, spent three days in making an examination and inspection of the respondent's school. The committee made a report in writing to the State Board of Health, showing the results of their inspection of respondent's school. A copy of this report was offered in evidence by relator, but on objection to its admission by respondent, the report was not admitted in evidence. The members of the inspection committee and Dr. Waite testified at the hearings in this case to what they saw and heard while inspecting the respondent's school. It appeared from their testimony that respondent had a dispensary in its school for the treatment of patients, but had no hospital connection for the use of the students.

"The curriculum of respondent purported to require attendance to complete the same for four school years or terms. The curriculum provided for the taking of the same subjects at the same time by Freshmen and Sophomores, and also by Juniors and Seniors. The curriculum was classed by Dr. Waite as a 'repetitive curriculum,' and not one of four years' requirements of progressive medicial studies.

"The records of the school were not complete at the time of the inspection by the committee. A student could not be traced through school by its records. There was not a complete record kept of credentials of students. The building in which the college was conducted was deemed to be ample for the purposes of the college, but the equipment for teaching medicine was in some respects deemed to be insufficient.

"At the time respondent's college was inspected by the committee of the State Board of Health, the number of students in attendance in the various classes was as follows: Freshmen, 11; Sophomores, 8; Juniors, 11; Seniors; 19.

"The respondent's records showed no credentials for six of the eleven Freshmen. One Sophomore had preliminary credits of record. One Junior had preliminary credits on the records. Of nineteen Seniors who were in the school for the first time, only seven had a record of preliminary credits.

"Dr. North, on cross-examination, testified that in his opinion respondent's college was not reputable."

At the close of all the evidence counsel for respondent entered an oral demurrer thereto which was overruled, and the commissioner further reported his conclusions of law, as follows:

"That a proceeding by *quo warranto* upon information by the Attorney-General will lie to forfeit the charter of a corporation for exercising corporate powers without authority or for the abuse, misuse or non-use of its corporate charter, is well settled in this State. [State ex inf. v. Standard Oil Co., 218 Mo. l. c. 345-354, and cases cited.]

"The burden of proof in this case rests upon the relator. [State ex rel. Walker v. Talbot, 123 Mo. 69-71.]

"The informant must prove the charges against respondent as laid in the information, or enough of them to constitute grounds in law for invoking the remedies sought against respondent, otherwise, the information will not be sustained." (Here the commissioner states the issues joined and the purpose of respondent's incorporation as hereinabove stated.

"A corporation organized under the general laws of the State as a college would have implied power to grant degrees and issue diplomas, which are but certificates thereof. [State ex rel. v. Gregory, 83 Mo. l. c. 130; 11 Corpus Juris, p. 983, par. 8, D.]

"It appears that the respondent had authority by the terms of its charter to grant degrees. The fraudulent exercise of such a power is such a misuser of the franchise of an educational institution as will justify its forfeiture. [Corpus Juris, p. 1000, par. 39-D; State v. Mount Hope College, 63 Ohio St. 341; Independent Medical College v. People, 182 Ill. 274; Illinois Health University v. People, 166 Ill. 171; Edgar Collegiate Institute v. People, 142 Ill. 363; 10 Cyc. p. 1291, par. XIII.]

"Acts and omissions of the officers and agents of a corporation are imputable to the corporation insofar as the grounds for forfeiture of its charter are concerned. [10 Cyc. p. 1085, par. IV; 8 Fletcher's Cyclopedia of Corporations, par. 5473.]

"The evidence in this case shows that the agent of respondent in charge of its school entered into arrangements with one Robert Adcox, under which Adcox procured the attendance of students at the respondent's school and the sums of money received from said students were divided between Adcox and the agent of respondent in charge

of its institution, and further that the agent of respondent, acting under his agreement with Adcox, gave advance standing to students so entering this school, to which they were not entitled under the rules held out by respondent, and thereby enabled the students to graduate and receive diplomas from respondent when they had not in fact completed the courses of study which respondent professed to require.

"Such conduct as recited above, and as further set out in the findings herein, constituted such a wilful abuse and misuse of the powers and franchises of respondent as to justify a forfeiture of the same.

"Respondent's officers and agents, in conducting and carrying on its functions as shown by the foregoing finding, were carrying on the business of said college primarily for pecuniary profit, which was a breach of respondent's contract with the State, and sufficient cause to warrant the forfeiture of respondent's charter. [Sec. 10271, R. S. 1919.]

"The fact that the respondent college was not recognized by the State Board of Health as a reputable college within the meaning of the Medical Practice Act did not *ipso facto* constitute a ground for the forfeiture of respondent's charter, but the failure of the respondent to maintain a school recognized as 'reputable' by the State Board of Health is evidence to be taken into consideration, with all other evidence in the case, in determining whether respondent had misused or abused its charter.

"The Attorney-General insists that respondent has violated Section 10272, Revised Statutes 1919, which requires a fair record to be kept by respondent of its proceedings, which record shall be open at all reasonable hours to the inspection of all its members. While the respondent's records were not complete, it cannot be said that there were no records or that the statute had been violated to the extent of justifying a forfeiture of respondent's charter, even though it were to be applied here. However, said section of the statute is for the benefit of the members of the corporation, and forfeiture of the charter of a corporation will not be adjudged for the violation of a statute for its internal government. [10 Cyc. p. 1279, par. D.]

"For the reasons set out above, the information of the Attorney-General should be sustained and judgment should be entered forfeiting respondent's charter and articles of incorporation and all its powers, franchises and privileges, and ousting respondent thereof."

The record in this case fully supports the commissioner's above findings of facts and justifies the application of his conclusions of law, and they are hereby approved and confirmed. It is therefore ordered and adjudged that respondent's charter and articles of incorporation, and all its powers, franchises and privileges be forfeited and respondent ousted thereof. All concur,